J-S09001-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: L.B., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.K., MOTHER | No. 1181 MDA 2015 |

Appeal from the Order Entered June 10, 2015
in the Court of Common Pleas of Lancaster County
Juvenile Court Division, at No(s): CP-36-DP-0000153-2014

| | |
|---|---|
| IN THE INTEREST OF C.B., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF R.K., A MOTHER | No. 1182 MDA 2015 |

Appeal from the Order Entered June 10, 2015
in the Court of Common Pleas of Lancaster County
Juvenile Court Division, at No(s): CP-36-DP-0000152-2014

BEFORE: PANELLA, J., LAZARUS, J., and JENKINS, J.

MEMORANDUM BY PANELLA, J.                     **FILED APRIL 08, 2016**

In these consolidated appeals, R.K. ("Mother"), the parent of the subject children, L.B., born in October 2008, and C.B., born in November 2005, ("Children"), appeals the orders entered June 10, 2015, granting the petitions filed by Lancaster County Children and Youth Services ("CYS" or

the "Agency") to adjudicate Children dependent and remove them from her custody and finding aggravated circumstances such that reunification services would not be provided for Mother. We affirm.

L.B.'s parents are Mother and J.C.; C.B.'s parents are Mother and A.B. Children resided in Virginia with Mother until August 2013. At that time, Mother and Children had been living in a homeless shelter and Mother decided to move to Pennsylvania. Mother brought Children and their belongings to her mother's ("Maternal Grandmother") home in Lancaster County, so Children could begin the 2013-2014 school year in Pennsylvania. Prior to this time, Mother and Maternal Grandmother had what the court described as a "love/hate relationship." Order of Adjudication and Disposition, Addendum, 6/10/15, at 1-2.

CYS's history with the family began on March 11, 2014. At that time, CYS received reports from the Commonwealth of Virginia, Prince William County Department of Social Services, Child Protective Services Division, ("CPS") concerning allegations of sexual abuse in Virginia. At the time, Children were living with Maternal Grandmother and Maternal Grandfather. CPS contacted CYS to request an interview with C.B. and L.B. concerning the allegations of abuse. C.B. and L.B. were individually interviewed by Children's Alliance, and both Children disclosed that physical and sexual abuse occurred in Virginia. CYS supplied CPS with the information.

On April 24, 2014, CYS again received report of alleged sexual abuse of the Children in both Pennsylvania and Virginia. The reports alleged that Mother was sexually abusing both L.B. and T., a younger sister of L.B. and C.B. CYS began an investigation. L.B. was again interviewed at the Lancaster County Children's Alliance. L.B. again disclosed that she was being sexually abused by both Mother and her stepfather, T.K. L.B. stated that Mother took both videos and pictures of the occurrences.

While the investigation was ongoing, it was reported to CYS that Mother informed Children's school that she planned on taking C.B. and L.B. back to Virginia. On May 2, 2014, Pennsylvania State Troopers took protective custody of C.B. and L.B., pending conclusion of the sexual abuse investigation. The next day, CYS filed a Stand By Petition for Temporary Custody. CYS also filed a Petition for Temporary Physical Custody and Legal Custody on May 5, 2014. On August 15, 2015, CYS filed a Petition for a Finding of Abuse requesting the court to find L.B. to be an abused child and further find that Mother was the perpetrator of the sexual abuse against L.B.

On May 6, 2014, the court held a shelter hearing. Mother waived the hearing without prejudice and without admitting any of the allegations set forth in the custody petition. Visitation of C.B. and L.B. was suspended pending the outcome of the criminal investigation against Mother and T.K.

The court held hearings on November 4, 2014, December 10, 2014, January 21, 2015, and February 3, 2015. At the hearings, CYS offered the

testimony of Mary Halye, a forensic interviewer for Children's Alliance; Kari Stanley, program supervisor of Lancaster Children's Alliance; Kate Egerter, intake caseworker for CYS; C.B.; L.B.; Craig Clearwater, C.B.'s therapist; Belinda Dickson, a Philhaven family-based therapist; Carrie Fitzpatrick, a Philhaven family-based mental health worker; Maternal Grandmother; C.L., a family friend; and Amanda Schreiber, the current CYS caseworker. Mother testified and offered the testimony of Amy Hermansen, Esquire, Mother's Virginia attorney; Vinchanzo Goodman, a CPS intake worker; Sarah Weatherford, a CPS family services worker; Michael Yankson, a CPS family services worker; Laura Simpson, Kindercare preschool director; C.B.'s Paternal Grandmother; and L.B.'s Paternal Grandmother. Father, who appeared *pro se*, also testified. The adjudication and disposition was concluded, and the record closed, at the February 3 hearing.

By the Orders of Adjudication and Disposition with the Addendum, entered on June 10, 2015, the trial court granted the petitions filed by CYS to adjudicate Children dependent and remove them from the custody of Mother, pursuant to Sections 6302 and 6351 of the Juvenile Act, and found aggravated circumstances such that reunification services would not be provided for Mother, pursuant to Section 6341(c.1) of that act. These timely appeals followed.

Our Supreme Court set forth our standard of review for dependency cases as follows.

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (citation omitted).

Additionally, "[t]he burden of proof in a dependency proceeding is on the petitioner to demonstrate by clear and convincing evidence that a child meets that statutory definition of dependency." *In re G., T.*, 845 A.2d 870, 872 (Pa. Super. 2004) (citation omitted).

Section 6302 of the Juvenile Act defines a "dependent child" as a child who

> (1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S.A. § 6302(1).

The Juvenile Act further provides, in pertinent part, the following.

> **(a) General rule.—** After hearing the evidence on the petition the court shall make and file its findings as to whether the child is a dependent child. . . .
>
> . . .
>
> **(c) Finding of Dependency.—** If the court finds from clear and convincing evidence that the child is dependent, the court shall

proceed immediately or at a postponed hearing, which shall occur not later than 20 days after adjudication if the child has been removed from his home, to make a proper disposition of the case.

42 Pa.C.S.A. § 6341(a) and (c).

A panel of this Court stated that

[a] court is empowered by 42 Pa.C.S. § 6341(a) and (c) to make a finding that a child is dependent if the child meets the statutory definition by clear and convincing evidence. If the court finds that the child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or public agency, or transferring custody to the juvenile court of another state. 42 Pa.C.S. § 6351(a).

*In re D.A.*, 801 A.2d 614, 617 (Pa. Super. 2002).

"The question of whether a child is lacking proper parental care and control so as to be a dependent child encompasses two discrete questions: whether the child presently is without proper care or control, and if so, whether such care and control are immediately available." *Id*., at 619 (citation omitted).

Section 6341(c.1) of the Juvenile Act provides as follows.

**(c.1) Aggravated circumstances.**—If the county agency or the child's attorney alleges the existence of aggravated circumstances and the court determines that the child is dependent, the court shall also determine if aggravated circumstances exist. If the court finds from clear and convincing evidence that aggravated circumstances exist, the court shall determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the home or to preserve and reunify the family shall be made or continue to be

made and schedule a dispositional hearing as required by section 6341(c.1) (relating to disposition of dependent child).

42 Pa.C.S.A. § 6341(c.1).

The Juvenile Act defines "Aggravated circumstances" as "[t]he child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent." 42 Pa.C.S.A. § 6302(2).

Regarding the placement of a child who has been adjudicated dependent, this Court has explained that

> [w]hen a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. Moreover, although preserving the unity of the family is a purpose of the Act, another purpose is to 'provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter.' 42 Pa.C.S. § 6301(b)(1.1). Indeed, the relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child.

*In re K.C.*, 903 A.2d 12, 14-15 (Pa. Super. 2006) (some internal citations and quotation marks omitted; brackets omitted; brackets added).

After careful review, we affirm the trial court's orders finding Children dependent, continuing Children in the legal and physical custody of CYS, and approving Child Permanency Plans without the goal of reunification with Mother, based on the thoughtful and well-written Opinion Sur Appeal of the Honorable Jay J. Hoberg.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/8/2016

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
JUVENILE COURT DIVISION

IN RE:

    C████████ B████████      :      No.   152   of   2014

    L████ B██████      :      No.   153   of   2014

## OPINION SUR APPEAL

On February 3, 2015, the record in the adjudication and disposition hearing was closed in the dependency proceedings involving C██████ B██████ (hereinafter "CB") and L███ B█████ (hereinafter "LB"). On June 4, 2015, the Court issued Orders of Adjudication and Disposition with an Addendum[1] finding the children dependent, continuing them in the legal and physical custody of the Lancaster County Children and Youth Social Services Agency (hereinafter "Agency"), and approving Child Permanency Plans without the goal of reunification with Mother, R█████ K█████ (hereinafter "Mother").[2] The Court found that LB was a victim of sexual abuse and that Mother was the perpetrator of that abuse. LB and CB continued to be placed in a kinship resource home with Maternal Grandparents, L████ B██████ (hereinafter "MGM") and S████ B██████ (hereinafter collectively "MGP"), who had been caring for both children since August, 2013.

Mother filed a timely Notice of Appeal for both children on July 10, 2015. The Superior Court consolidated sua sponte the appeals at 1181 MDA 2015 and 1182 MDA 2015. She asserts two issues in her 1925(b) statement for CB and three issues in her 1925(b) statement for LB. First, Mother claims the Court lacked clear and convincing evidence that she was unable to provide proper parental care and control of the children. Second, Mother claims the Court erred

---

[1] The Court's Adjudication/Disposition Order in each case was docketed by the Clerk of Courts on June 10, 2015.

[2] *See* Petitioner's Exhibits 11 and 12.

1

in finding that Mother sexually abused LB because it relied on LB's testimony, arguing LB was not competent to testify and the evidence relied upon was tainted and inconsistent. Finally, Mother claims the Court erred in failing to approve a Child Permanency Plan of return home to Mother because it did not find aggravated circumstances and Mother demonstrated she could provide for her children.[3]

The Agency's history with the family began on March 11, 2014, when the Agency received reports from the Commonwealth of Virginia, Prince William County Department of Social Services, Child Protective Services Division (hereinafter "CPS") concerning allegations of sexual abuse in Virginia. At that time, CB and LB were living in Pennsylvania with MGP. CPS contacted the Agency to request a courtesy interview of CB and LB concerning these allegations. CB and LB were individually interviewed by Children's Alliance and both children disclosed that physical and sexual abuse occurred in Virginia.[4] The Agency supplied Virginia with this information.

On April 24, 2014, the Agency again received reports of alleged sexual abuse for the children,[5] perpetrated both in Pennsylvania[6] and Virginia. The reports alleged Mother was sexually abusing both LB and T. A sexual abuse investigation began and LB was again interviewed at the Lancaster County Children's Alliance on May 1, 2014[7]. LB again disclosed that she was being sexually abused by both Mother and her stepfather, T██████ K██████ (hereinafter "TJ"). LB stated that Mother took videos and pictures of these occurrences.

---

[3] While the first and third issues are included for both children, the Court notes that on CB's they are listed as 1 and 2.

[4] *See* Petitioner's Exhibit 2 (LB's April 4, 2014, DVD interview) and Exhibit 8 (CB's April 4, 2014, DVD interview) as well as the transcripts of those respective interviews.

[5] The family consisted of Mother, LB, CB, Terrance (hereinafter "T"), and Natasia (hereinafter "N").

[6] *See* Petitioner's Exhibit 4, 11/4/14: Child Protective Service Investigation Report.

[7] *See* Petitioner's Exhibit 3 (LB's May 1, 2014, DVD interview) as well as the transcript of that interview.

2

While the investigation was still ongoing, it was reported to the Agency that Mother informed the children's school that she planned on taking CB and LB back to Virginia. On May 2, 2014, Pennsylvania State Troopers took protective custody of CB and LB pending conclusion of the PA sexual abuse investigation.[8] On May 3, 2014, the Agency filed a Stand By Petition for Temporary Custody and a Petition for Temporary Physical and Legal Custody on May 5, 2014. As a result of the Agency's investigation, an indicated child abuse report was filed with Childline naming Mother as a perpetrator of sexual abuse against the children. (See Petitioner's Exhibit 4). On August 15, 2014, the Agency filed a Petition for a Finding of Abuse requesting the Court find LB to be an abused child and further find that Mother is the perpetrator of the sexual abuse against LB.

On May 6, 2014, the shelter care hearing was held before this Court. Mother waived the hearing without prejudice and without admission any of the allegations set forth in the petition for custody. Visitation was suspended pending the outcome of the criminal investigation against Mother and TJ.

Hearings were held on November 4, 2014, December 10, 2014, January 21, 2015, and February 3, 2015. The Agency offered the testimony of Mary Halye, a forensic interviewer for Children's Alliance; Kari Stanley, program supervisor of the Lancaster Children's Alliance; Kate Egerter, intake caseworker for the Agency; CB; LB; Craig Clearwater, CB's therapist; Belinda Dickson, a Philhaven family-based therapist; Carrie Fitzpatrick, a Philhaven family-based mental health worker; Linda Bergman, MGM; Charlotte Lapp, a family friend; and Amanda Schreiber, the current Agency caseworker. Mother testified and offered the testimony of Amy Hermansen, Mother's VA attorney; Vinchanzo Goodman, CPS intake worker; Sarah Weatherford, a CPS

---

[8] T and N were taken into protective custody on May 3, 2014. PA State Police released T and N back into Mother's custody for lack of jurisdiction. *See* Petitioner's Exhibit 7, 12/10/14; N.T. 11/4/14, 41.

3

family services worker; Michael Yankson, a CPS family services worker; Laura Simpson, Kindercare preschool director; Lillian Campbell, CB's paternal grandmother; and Brenda Brent, LB's paternal grandmother. Father, who appeared pro se, also testified. The adjudication and disposition was concluded and the record closed at the February 3, 2015, hearing. The Orders of Adjudication and Disposition with the Addendum were docketed on June 10, 2015. Mother has filed a timely appeal.

This Court's decision that both CB and LB were dependent children is supported by the totality of the record. The Court's Addendum attached to each Order summarizes the Court's reasoning in reaching its decision. A dependent child is one who "is without proper parental care and control, subsistence, education as require by law, or other care or control necessary for his physical, mental, or emotional health or morals." Juvenile Act, 42 Pa. C.S.A. §6302. A finding of dependency requires clear and convincing evidence. In re A.L, 779 A.2d 1172 (Pa. Super. 2001). The Agency has the burden of establishing clear and convincing evidence that the child is, at the time of adjudication, without proper parental care and control and that such care is not immediately available. In Interest of Hall, 703 A.2d 717 (Pa. Super. 1997). Clear and convincing evidence exists when testimony given is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." In re J.L.C., 837 A.2d 1247, 1251 (Pa. Super. 2003).

Whether children in a dependency proceeding are lacking proper parental care and control requires the Court to analyze: whether the child at the time of the hearing is without proper parental care or control, and if so, whether such care and control is immediately available. Matter of C.R.S., 696 A.2d 840 (Pa. Super. 1997); 42 Pa. C.S.A. §6302 (1999). Mother claims the Court did not have sufficient evidence to conclude that she was unable to provide proper

4

parental care and control over CB and LB. The Court disagrees based upon the totality of the record. A finding of abuse may support an adjudication of dependency. Matter of C.R.S., *supra*. By doctrine of incorporation, the definition of child abuse in the Child Protective Services Law is incorporated into the Juvenile Act's definition of a dependent child. In re J.R.W., 631 A.2d 1019, 428 Pa. Super. 597 (1993). In the June 4, 2015, Order and Addendum, the Court found LB to be the victim of sexual abuse and found Mother the perpetrator of that abuse.

The record supports these findings. LB, whose credibility will be addressed later in this opinion, disclosed the abuse to the Pennsylvania State Police, MGM, caseworkers, forensic Children's Alliance forensic interviewers, and this Court. Her testimony was generally consistent. After reviewing the Children's Alliance interviews and personally observing and listening to LB in Chambers, the Court was satisfied that her testimony was not tainted and that her testimony was not the product of being coached or told what to say. She revealed a home in which there were few boundaries and one in which she was subjected to sexual abuse. LB was referred to Pennsylvania Counseling Services Children's Services and, on September 16, 2014, was given an Initial Psychological Evaluation. (See Petitioner's Exhibit 7, 12/10/14). The subsequent report noted LB's concerning sexual behaviors. Moreover, she displayed troubling social behaviors: "[LB] and [CB] have extreme sibling rivalry, which often turns violent. [LB] likes to antagonize her brother and laugh even when [CB] is physically hurt. [LB] sees the adults as peers and does not respect them." Id. at 2. The report further stated that LB talks about the acts frequently, including abuse performed on her and abuse she was made to perform on others. During her evaluation, LB produced a graphic drawing of Mother sexually abusing her.[9] LB stated she was forced to drink alcohol. LB was diagnosed with posttraumatic stress disorder.

---

[9] *See* Petitioner's' Exhibit 5, 11/4/14

5

The abuse is further supported by the testimony received from CB's therapist and from CB. CB is very guarded about what has happened to him in the past. He is anxious, has nightmares, has trouble sleeping, has experienced bed wetting, and has anger issues. He has been diagnosed with posttraumatic stress disorder and depression. He disclosed being physically abused by Mother and witnessing instances of physical and sexual abuse in Mother's home. He offered testimony about the lack of appropriate sexual boundaries in Mother's home. He stated drugs were used in Mother's home and that the children were forced to drink alcohol. His therapist, Mr. Clearwater, testified concerning CB's need for therapeutic intervention:

> He reported feeling very angry towards [his father and biological mother]…he frequently lashes out physically against his sister, and directly and indirectly through activities we've done in session, he's reported a lot of anger towards his sister and his mother…it's pretty significant. It's way beyond what would be typical in someone his age. N.T. 12/10/14, 189.

Mr. Clearwater further testified that children who have been coached with stories but didn't experience them would not display the level of anger and associated behaviors that CB displays.

The record supports this Court's conclusion that these children have been emotionally and physically damaged while in the custody of Mother. They manifest symptoms of abuse. They do not want to return to Mother's home. The abuse they suffered and witnessed and the resulting damage to their physical and emotional well-being, supports the finding of dependency.

Mother disputed the claims of abuse and offered testimony from a number of individuals that she is an appropriate caregiver, including testimony from a number of CPS caseworkers from Virginia who investigated a number of referrals regarding the family, including the sexual

6

abuse complaint which is the subject of this proceeding, all investigations were unfounded. (See Mother's Exhibits 2, 3, and 4). She also attacked the credibility of MGM.

Michael Yankson, a CPS caseworker in Virginia explained that they made a referral to Lancaster County to conduct an interview of LB and CB. They received the DVDs of the interviews and did not find the children's testimony to be credible because of the papers they had in their possession during the interviews. The complaint was deemed to be unfounded by Virginia.[10] This Court strongly disagrees with the Virginia decision. This Court had far more extensive evidence to consider, including the ability to personally observe and listen to the children in Chambers and the testimony from the therapists for the children which supports their claims. The fact that their notes were available does not mean their testimony lacked truthfulness or that they were not credible. A review of their testimony reflected on the DVDs, which have been admitted into evidence, indicates brief references to the items listed and their extensive, extemporaneous testimony based up on their recollections. This is particularly true of LB's testimony. Her description of things that she experienced were detailed. She was not reading from the pages which she brought into the interview. Copies of the pages to which the children referred are marked as Petitioner's Exhibit 1. The Court also notes with some interest that Mr. Yankson, in response to a question from the Guardian ad Litem for the children, admitted to sometimes referencing notes while testifying. N.T. 1/21/15, 385.

At the hearing on January 21, 2015, Mother also presented testimony to support her claim that MGM was a danger to the children and she was coaching the children to make claims of sexual abuse against Mother. First of all, no matter how much Mother wants to make this case about MGM, it is about the abuse allegations against Mother. Her testimony included the legal

---

[10] N.T. 1/21/15, 383-384.

custody battles in Virginia, as well as testimony on MGM's Adam Walsh report of Child Abuse/Neglect with a founded disposition of child neglect in VA. CPS conducted an investigation in April 2013, based upon reports that the children were left without adult supervision. MGM was watching the children while Mother was sleeping. MGM left the children in the playground area of Mother's apartment complex to check into a hotel nearby. Mother was at home during this time. N.T. 1/21/15, 373. The CPS caseworker further testified that this led to a finding of physical neglect against MGM because MGM did not properly pass responsibility of the children, who were playing in a designated playground outside the apartment, back to Mother, who was inside the apartment. It should be noted that CB was seven and a half years of age at the time.

Second, CPS provided the Agency with additional information regarding the investigation and the level three (3) finding of physical neglect under Virginia Child Protective Services law. The Agency concluded, "based upon communications with the Virginia Department of Social Services, [the Agency] believes that the above finding does not meet the standard of a founded report in Pennsylvania and that it is not cause for disapproval of the [MGP's] home for kinship placement of [CB and LB]."[11]

The Court emphasized on the record that the purpose of the adjudication/disposition hearing was not where the children would be placed, but whether the children were dependent as to Mother and, if found dependent, whether reunification with Mother was appropriate. Much of Mother's rebuttal of the Agency's evidence hinges on Mother's assertion that MGM is coaching the children to gain custody. The Court did not find evidence of coaching or that MGM planted the allegations of abuse in their minds. A fair amount of the evidence Mother presented at the

---

[11] *See* Order 6/30/14; Order 8/8/14.

8

hearing was to establish the contentious history of custody between Mother and MGM and to attack MGM's credibility.

There is no question that Mother and MGM appear to have what can only be described as a "love/hate" relationship that has been ongoing for years, with much of the animosity revolving around Mother's parenting. The fact that Virginia authorities conducted numerous investigations of Mother, which were unfounded, is not dispositive of the issues before this Court. After listening and observing MGM in this hearing, the Court found that she was credible and consistent in testimony. It is clear to the Court that she has acted in the best interest of the Children in this case and that both are currently doing well in her care. This Court agrees with the Agency's position that MGM's home was a safe placement for the children and approved the Agency's request not to remove the children based upon this report.

However, having evaluated the facts developed at the hearing, the Court believes Mother presents an unreasonable risk to the physical, mental and emotional health of the children. Based upon totality of the record, the Court declared the children dependent. The facts and circumstances presented to this Court unquestionably prove clear and convincing evidence that Mother has not met the minimum standards for parental care and support of this child. The Agency proved by clear and convincing evidence that Mother was unable to provide proper care and control for these children.

Next, Mother argues the Court erred in relying on LB's testimony in finding Mother the perpetrator of abuse against LB. In the Order and Addendum, the Court agreed with the Agency's request and the Guardian's recommendation that LB was sexually abused and that Mother was a perpetrator of that abuse.

9

The determination of whether LB suffered abuse and whether Mother was the perpetrator of that abuse is guided by the Child Protective Services Law (CPSL) 23 Pa.C.S. §6303(b). The pertinent part of the statute provides as follows:

(a) "sexual abuse or exploitation" is any of the following:

(1)    The employment, use, persuasion, inducement, enticement or coercion of a child to engage in or assist another individual to engage in sexually explicit conduct.

(2)    The employment, use, persuasion, inducement, enticement or coercion of a child to engage in or assist another individual to engage in simulation of sexually explicit conduct for the purpose of producing visual depiction, including photographing, videotaping, computer depicting and filming.

...

(b) Child abuse –

(1)    the term "child abuse" shall mean any of the following:

(ii)    An act or failure to act by a perpetrator which causes non-accidental serious mental injury to or sexual abuse exploitation of a child under 18 years of age.

(iii)    Any recent act, failure to act or serious of failures to act by a perpetrator which creates an imminent risk of serious physical injury to or sexual abuse or sexual exploitation of a child under 18 years of age.

A perpetrator is defined as "a person who has committed child abuse and is a parent of a child, a person responsible for the welfare of a child, an individual residing in he same home as a child or a paramour of a child's parent." 23 Pa.C.S.A. §6303. Innuendo and suspicion alone are not enough to compel finding of child abuse. Matter of Read, 693 A.2d 607 (Pa. Super 1997).

The child must be qualified to testify as a witness in the case. Whether a child is competent to testify depends on his intelligence and comprehension of the obligation to tell the truth. Commonwealth v. Allabaugh, 162 Pa. Super. 490, 58 A.2d 184 (1948). In determining competency, the court will consider factors including the child's basic ability to communicate, to understand questions, and provide appropriate responses, to observe and recall an event, to differentiate between reality and make-believe, and to understand the consequence of telling a lie." Commonwealth v. Delbridge, 580 Pa. 68, 859 A.2d 1254 (2004). It is within the Court's

10

discretion to determine whether a child will be permitted to testify. Once the child is qualified as competent, the judge must determine the weight to be given his testimony. The child's testimony must be viewed in the context of his maturity, honesty and intelligence.

This Court made factual and credibility determinations to reach its decision. It found the evidence was credible and consistent. Mother argues such a finding is not clear and convincing because the Court relied upon the testimony of LB, which VA caseworkers considered but did not find credible. The Court disagrees with her argument that LB's testimony was insufficient, but notes it also considered the totality of the circumstances. The VA caseworker testified that, without interviewing the children themselves, the investigation was determined unfounded because the video taken of the Children's Alliance interviews showed that CB and LB brought in paper and read from that paper. The children's reliance on a paper is not the only evidence in this case establishing sexual abuse and, unlike the VA Agency, it is not the sole factor upon which the Court based its finding of abuse. After having reviewed the record, watching the interviews with Children's Alliance, having the benefit of personally interviewing the children, and considering the testimony of their respective therapists, this Court found their statements to be consistent and credible that they were abused and that Mother was the perpetrator of that abuse and the Court resolved the issue of credibility in favor of the children.

It is clear and convincing that these children were without proper parental care and that their sexual abuse would not have occurred but for Mother's actions and failure to protect them. The cumulative effect of LB's testimony, her detailed and consistent statements of sexual abuse, the substantiated child abuse by the Children's Alliance indicated child abuse report, and LB's overly sexualize behavior are sufficient to support of finding of child abuse pursuant to §6303(b)(1)(ii) and (iii). The interview of both CB and LB identify Mother as a perpetrator not

11

only by omission, but also by engaging in the acts herself. Mother had a duty to protect her children from others who may inflict harm. In re R.P., 957 A.2d 1205 (Pa. Super. 2008).

Finally, Mother alleges that there is insufficient evidence in the record to support the Court's disposition to not give Mother a plan because there was no finding of aggravated circumstances and Mother demonstrated she could provide for her children. Once a child has been adjudicated dependent, dispositional decisions in the context of permanency planning are made according to what is in the best interest of the child. In re J.S.W., 438 Pa. Super. 46, 651 A.2d 167, 169 (1994). The Superior Court has held that providing no plan for reunification can be an appropriate decision, depending on the factual circumstances, even when aggravated circumstances are not alleged. In re R.T., 778 A.2d 670 (Pa. Super. 2001).

Based upon the totality of evidence set forth in the record, this Court determined it was in the best interest and welfare of the children that Mother not be provided a plan for reunification, without a specific finding of aggravated circumstances.

Although, the Agency sought a finding of aggravated circumstances against Mother, neither the Agency nor the Guardian followed the procedural requirements of 42 Pa. C.S.A. § 6334(b). While the Court believes that the record does establish the existence of aggravated circumstances against Mother, the allegation was not properly before the Court and such a finding was never made.

The totality of the record establishes by clear and convincing evidence that CB and LB are dependent children, that LB is a victim of sexual abuse, that Mother was the perpetrator of sexual abuse, and that CB and LB have been exposed to and experienced ongoing domestic violence, inadequate supervision, unstable housing and a lack of sexual boundaries during their young lives. The Court did not find Mother's testimony and the testimony of her witnesses to be

12

persuasive of her assertion that she is capable of providing proper parental care to CB and LB. Based upon this record, it is in the best interest of these children that Mother not be given a plan for reunification. CB should remain in the resource home of his MGP. LB should remain in the resource home of her MGP until such a time as the requirements of the Interstate Compact have been completed and she can be transferred into the physical and legal custody of Father.

The Adjudication/Disposition Order entered by the Court on June 6, 2015, should be affirmed.

The Clerk of Courts is directed to forward the record to the Superior Court.

BY THE COURT:

Date: _August 10, 2015_

_____
JAY J. HOBERG, JUDGE

ATTEST:

Copies to:

Anne Cooper, Agency Attorney
Jeffrey Gonick, Guardian ad Litem
Richard Groman, Mother's Attorney
Office of Court Administration
Children and Youth Agency (2)

I certify this document to be filed in the Lancaster County Office of the Clerk of the Courts.

Joshua G. Parsons
Clerk of the Courts

13