J-S06002-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 954 EDA 2017 |

Appeal from the Order Entered February 17, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-DP-1000194-2016

BEFORE:  BOWES, J., McLAUGHLIN, J., and MUSMANNO, J.

MEMORANDUM BY BOWES, J.:                **FILED APRIL 12, 2018**

M.R. ("Mother") appeals from the respective orders entered on February 17, 2017, that (1) deemed Mother a perpetrator of child abuse against her son, M.R.; (2) determined that aggravated circumstances existed as to mother; and (3) directed that reasonable efforts toward reunification were no longer warranted.  We affirm.

The record reveals the following pertinent facts and procedural history. M.R. was born during May 2009.  On February 2, 2015, DHS received a report alleging that Mother physically abused M.R., then age six.  Upon investigation, the report was indicated.  DHS implemented a safety plan placing M.R. in the home of his father, D.J. ("Father").  In 2016, Father returned M.R. to the care of Mother.

On May 27, 2016, DHS received a second report alleging that Mother physically abused M.R. The trial court immediately placed M.R. in protective custody, and transferred him to shelter care three days later. On June 10, 2016, the court adjudicated M.R. dependent. On that date, the investigation into the May 27, 2016 report remained pending. The court scheduled a child abuse hearing for September 9, 2016, which was continued upon agreement of the parties.

In the interim, a permanency review hearing occurred on December 9, 2016. The trial court found that Mother was in substantial compliance with her single case plan ("SCP") objectives, which included participating in mental health treatment at the Wedge Recovery Center; participating in a parenting program and anger management at the Achieving Reunification Center ("ARC"); and participating in supervised visits with M.R. N.T., 2/17/17, at 20.

On February 17, 2017, a combined permanency review and child abuse hearing occurred. DHS presented the testimony of Kitia Scott, the Community Umbrella Agency ("CUA") supervisor; Latoya Gallman, M.R.'s school counselor; and Jamir Butler and Belinda Twumasi, the DHS social services managers who investigated the reports of physical abuse. Mother testified on her own behalf. As it relates to the issues on appeal, during the permanency review hearing, DHS requested findings of child abuse and aggravated circumstances as to Mother.

On February 17, 2017, the trial court entered a permanency review order finding that Mother committed "child abuse" against M.R.as the term is defined in § 6303(b.1) of the Child Protective Services Law ("CPSL"), which we reproduce *infra*. In addition, the court acknowledged that Mother was in full compliance with her permanency plan. However, by separate order entered on the same date, the court found that aggravated circumstances existed against Mother pursuant to 42 Pa.C.S. § 6341(c.1) and directed that no reasonable efforts be made to reunify her with M.R.

Mother timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court filed its Rule 1925(a) opinion on October 27, 2017.

On appeal, Mother presents the following issues for our review:

1. Did the trial court [err] when it found that [DHS] by clear and convincing evidence had met its burden to establish that aggravated circumstances and child abuse exist as to Mother pursuant to 23 Pa.C.S.A. § 6300, *et al*.?

2. Did the trial court [err] when it found that no efforts are to be made to preserve the family and reunify the child with the Mother and that [DHS] had met its burden pursuant to 23 Pa.C.S.A. § 6300, *et al*.?

Mother's brief at vi. Through appointed counsel, M.R. joined in the brief filed by the Philadelphia Department of Human Services ("DHS") in support of the subject order.

The following legal principles are pertinent to our review.

[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility

> determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. *In re R.J.T.,* 9 A.3d 1179, 1190 (Pa. 2010). We review for an abuse of discretion, *id*. . . .

*In the Interest of L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015).

Dependency proceedings are governed by the Juvenile Act, 42 Pa.C.S. §§ 6301–6375. However, the CPSL controls determinations regarding findings of child abuse, which the juvenile courts must find by clear and convincing evidence. *See In the Interest of J.R.W.*, 631 A.2d 1019 (Pa.Super. 1993). The CPSL defines "child abuse" as follows:

> **(b.1) Child abuse.--** The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:
>
> > (1) Causing bodily injury to a child through any recent act or failure to act.
> >
> > . . . .
> >
> > (5) Creating a reasonable likelihood of bodily injury to a child through any recent act or failure to act.
> >
> > . . . .

23 Pa.C.S. § 6303(b.1). Furthermore, the statute defines "bodily injury" as "[i]mpairment of physical condition or substantial pain." 23 Pa.C.S. § 6303(a).

If the juvenile court determines that a child is dependent and aggravated circumstances have been alleged by either the county agency or by the child's attorney, the court must also determine whether, by clear and convincing evidence, aggravated circumstances exist. 42 Pa.C.S. §

- 4 -

6341(c.1).  The Juvenile Act defines "aggravated circumstances" as follows, in relevant part.

> "**Aggravated circumstances***."* Any of the following circumstances:
>
> . . . .
>
> (2) The child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent.
>
> . . . .

42 Pa.C.S. § 6302.  Serious bodily injury is "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." *Id.*

If the juvenile court determines that aggravated circumstances exist, it "shall determine whether or not reasonable efforts . . . to preserve and reunify the family shall be made or continue to be made. . . ."  42 Pa.C.S. § 6341(c.1).  A court may end reasonable efforts at its discretion.  *See In re L.V.*, 127 A.3d 831, 839 (Pa.Super. 2015) (citing *In re A.H.*, 763 A.2d 873, 878 (Pa.Super. 2000)).

In her first issue, Mother argues that the evidence is insufficient to support the court's findings of "child abuse" and "aggravated circumstances."  She advances her argument with discussion and analysis of the CPSL only, and not with the relevant provisions of the Juvenile Act,

*supra*. Moreover, her argument is founded upon an outdated definition of "child abuse." Specifically, Mother asserts:

> [S]erious physical injury is any injury that causes "severe pain" or "significantly impairs" the child's ability to function physically. 23 Pa.C.S. § 6303(b). There is no testimony from any witness that [M.R.] was ever in "severe pain" or had any type of significant impairment to his ability to function physically.
>
> In addition, there was nothing in the testimony which indicated any recent act, failure to act or series of acts on the part of [M]other which created an imminent risk of serious physical injury [or] serious physical neglect which endangered the child's life or development or impaired his functioning.
>
> Hence, there was no evidence to support a finding of child abuse as to [M]other under 23 Pa.C.S. § 6303(b).

Mother's brief at 5.

However, as previously noted, the CPSL was amended, effective December 31, 2014, "to broaden the term 'child abuse' significantly." ***In the Interest of L.Z.***, ***supra*** at 1168 n. 3. For instance, "bodily injury" is now defined as "[i]mpairment of physical condition or substantial pain," which is considerably broader than the prior requirement of 'serious physical injury.' [23 Pa.C.S.] § 6303(a)." ***Id***. As Mother's instant argument relies upon the definition of child abuse in the prior version of § 6303, it is defective.

In contrast to Mother's misdirected assertion, the trial court relied upon the correct version of § 6303, as set forth above, to determine that Mother perpetrated child abuse against M.R. Specifically, the court reasoned as follows.

M.R. reported to his school counselor and teacher he was physically abused by his Mother on two separate occasions. The school counselor testified M.R. reported he was beaten with an extension cord and a stick by his mother on both occasions. [The] [s]chool counselor and nurse personally observed several bruises and welps [sic] on M.R.'s body. At the time of both incidents, M.R. reported high level of chest and hand pain. [The] . . . counselor testified M.R.'s injuries . . . impaired his mobile functions to participate in school. [She] found M.R.'s story of the beatings and description of a high level of pain to be credible.

The DHS social worker investigator of child abuse and neglect testified M.R. . . . [was a victim] of physical abuse. DHS confirmed allegations of the Child Protective Services (CPS) reports where Mother was identified as the perpetrator of the physical abuse on both occasions. The DHS investigator personally observed M.R.'s bruises and injuries. Furthermore, DHS testified that a safety plan for M.R. was implemented because M.R. stated he was fearful to return home. M.R. is receiving therapeutic treatment for Posttraumatic Stress Disorder (PTSD) as a result of the physical abuse.

[The] [s]ocial worker manager testified she interviewed . . . M.R. [with respect to] the allegations of physical abuse[,] including but not limited [to,] beatings, hitting and punching. [She] indicated that M.R.'s injuries appear to be an extension cord mark on his chest in the shape of a U. M.R. expressed a pain level of 10 with 10 being the most painful.

[The] [s]ocial worker testified during the interview [that] M.R. expressed he was fearful of returning home due to concern Mother would continue to inflict physical harm on him. Furthermore[,] during [the] investigation, M.R. reported [that] the physical abuse was ongoing and [that] it was his Mother's typical form of discipline.

Mother testified she did not possess any belts, extension cords or weapons. Mother . . . denied any physical abuse of M.R. [and] . . . testified that DHS social workers and M.R. were false in their stories. Furthermore, Mother testified M.R.['s] . . . injuries were caused by playing outside.

Trial Court Opinion, 10/27/17, at 3 (citations to record omitted).

The certified record supports the court's findings. Latoya Gallman, who was M.R.'s school counselor during 2015 and 2016, testified that M.R.'s teacher sent him to her twice with injuries. On the first occasion, M.R. stated "that he was beaten with an extension cord[.]" N.T., 2/17/17, at 46. Specifically, M.R. informed her that "it had happened a few times before . . . [a]nd . . . that mom was . . . mad at him for [being] late to school." *Id*. Ms. Gallman testified that M.R. was fearful of returning home. *Id*. at 47. Ms. Gallman took M.R. to the school nurse for a physical examination, that revealed, "bruises and welps [sic]" on the child's back. *Id*. at 46-47. Further, Ms. Gallman testified that M.R. "said he was in pretty bad pain. . . ." *Id*. at 48.

On the second occasion, M.R. disclosed that he had sustained additional injuries to his hand, chest, and back while trying to shield himself from Mother's assault with an extension cord and a stick. *Id*. Again, Ms. Gallman accompanied M.R. to the school nurse, and during the ensuring physical examination, she personally observed bruises on his "chest area." *Id*. at 49. She stated that M.R. complained of pain in his hand, which resulted from "trying to shield himself" during the beating. *Id*. She explained that the pain was so significant that it was difficult for him to write. *Id*. at 50.

Jamir Butler, the DHS social services manager, testified that he investigated the February 2, 2015 report of Mother's physical abuse of M.R.

The report alleged M.R. "had two scratches on the left side of his forehead and . . . [M.R.] reported that he was smacked in the face by his mother sometime in the past. It also stated that . . . Mother . . . pushed [M.R.] down the steps." *Id*. at 63-64. Mr. Butler observed "a linear scratch on the right side of [M.R.'s] right hand" that was "about four to five inches long." *Id*. at 64, 72. In addition, M.R. "had bruising on his forehead[,] . . . linear marks . . . up and down his back[,] and old linear marks on his back that appeared to be welts" or healing bruises. *Id*. at 64, 72. The investigator also described "an old burn mark [o]n the front of the stomach." *Id*. at 64. Moreover, Mr. Butler confirmed that M.R. identified Mother as the perpetrator of his abuse. *Id*. Specifically, M.R. stated that the welts on his back "came from his mom using sticks and cords" to beat him. *Id*. at 72-73. Mr. Butler deemed M.R. credible." *Id*. at 65, 67. As such, he determined that the report was indicated as to Mother's physical abuse of M.R. *Id*. at 63.

Belinda Twumasi was the DHS social work service manager who investigated the May 27, 2016 report. She testified that M.R. reported being "beaten by mom with an extension cord, and he also stated that he was punched by mom." *Id*. at 85. M.R. stated that Mother punched him "[i]n the back side." *Id*. Ms. Twumasi personally observed injuries on M.R., which she described as being consistent with being whipped with an extension cord. She explained,

> [M.R.] had an extension cord mark on his chest that was in the shape of a U, as if it was wrapped around and then hit. It was right above his chest area. And then he also had red marks on his hand areas. And then he had some older bruises that were linear in shape.

*Id*. Further, she testified that M.R. stated that his level of pain was "a 10 out of a 10," with 10 being the most painful. *Id*. at 86. Ms. Twumasi testified that M.R. told her "this is how mother typically disciplines him." *Id*. Ms. Twumasi also confirmed that the hand injury he sustained in the assault prevented him from holding a pencil correctly. *Id*. at 86-87.

Mother denied the allegations of physical abuse that had been leveled in both reports. *Id*. at 93-95. She testified that M.R. was not telling the truth, and she called him "a liar." *Id*. at 96-97. Mother baldly asserted, "when [M.R. is] upset, he tells the school something." *Id*. at 96. Further, Mother testified that she does not own an extension cord and attempted to explain M.R.'s scares and bruises as the result of "normal things that kids do." *Id*. at 94, 101.

All of the foregoing evidence supports the trial court's conclusion that Mother committed "child abuse" against M.R. pursuant to § 6303(b.1)(1) and (5) of the CPSL, *supra*. The evidence demonstrates that Mother intentionally caused bodily injury by striking M.R. with objects in a manner that endangered him. Specifically, DHS's witnesses validated that M.R. suffered impairment of physical condition or substantial pain as a result of his injuries. *See* 6303(a) (defining bodily injury as "Impairment of physical

condition or substantial pain"). Likewise, the evidence supports the court's determination that aggravated circumstances exist as to Mother pursuant to § 6302, in that at least one injury impaired the function of a bodily member, M.R.'s hand. Multiple witnesses testified that the injuries that Mother inflicted upon M.R.'s hand impaired its function insofar as he could not hold a pencil to complete his classwork. Accordingly, we discern no abuse of discretion.

In her second issue, Mother argues that the court erred in ordering that reasonable efforts toward reunification were no longer required. Mother asserts that since she was in full compliance with her SCP objectives, the court's decision was tantamount to an abuse of discretion. While Mother's characterization of her progress is accurate, no relief is due.

At the conclusion of the testimonial evidence, the court stated on the record in open court that Mother was fully compliant with her SCP objectives. N.T., 2/17/17, at 115. However, the trial court also highlighted the overarching safety concern that required DHS to supervise Mother's visitations with her son. *Id*. Moreover, the court recognized that Mother was incapable of remedying the behavior that created the underlying safety issues. It reasoned,

> [A]t some point in time mom has to have insight as to what brought the case into court. And based on the testimony presented today and based on mom's presence today and her testimony, I don't think that mom really gets . . . why we're here. I think that mom at best minimizes what happened or

totally rejects it, especially when she's calling a seven-year-old a liar.

*Id*.

In its Rule 1925(a) opinion, the trial court further explained, "due to the allegations of child abuse of M.R. by Mother, reasonable efforts to reunify M.R. with Mother were not in the best interest of the child, based on the testimony regarding the child's safety, protection, mental, physical and moral welfare." Trial Court Opinion, 10/27/17, at 4. Our review of the certified record verifies the court's concerns notwithstanding Mother's progress with her SCP objectives. Thus, for the reasons outlined above, we discern no abuse of discretion by the court in directing that DHS need not continue to employ reasonable efforts to reunify M.R. with Mother pursuant to § 6341(c.1). *See In re L.V.*, 127 A.3d at 839. As such, Mother's second issue fails.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/12/18